**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

JOSEPH POST,                              :
                                          :
            Petitioner,                   :
                                          :
      v.                                  :            NO. 06-2103 (JAP)
                                          :
GEORGE W. HAYMAN, et al.,                 :            **OPINION**
                                          :
            Respondent.                   :
_____:


            APPEARANCES:

            BENEDICT & ALTMAN, ESQS.
            Joseph J. Benedict, Esq.
            247 Livingston Avenue
            New Brunswick, New Jersey 08901
                  Attorney for Petitioner

            MERCER COUNTY PROSECUTOR'S OFFICE
            Brian McCauley, Esq., Assistant County Prosecutor
            Broad and Market Streets
            Trenton, New Jersey 08650
                  Attorneys for Respondents


PISANO, District Judge.

      Petitioner Joseph Post, a prisoner currently confined at East New Jersey State Prison in

Rahway, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  The respondents are the Commissioner of the New Jersey Department of Corrections,

George W. Hayman, and Anne Milgram, Attorney General.[1]  Respondents filed an Answer to the petition, arguing that the relief sought should be denied.  For the reasons set forth below, the petition is denied.

## I.  Background

Petitioner challenges a judgment of conviction entered on July 21, 1997, in the Superior Court of New Jersey, Law Division, Mercer County, after a jury convicted him of first degree murder, possession of a weapon with an unlawful purpose and possession of a knife under circumstances not manifestly appropriate.  As a result of his conviction, Petitioner was sentenced to life imprisonment with a thirty-year mandatory period of incarceration on counts one and two, and a concurrent eighteen month term was imposed for count three.  *State v. Post*, Docket No. A-606-03T1 at 2 (N.J. Sup. Ct. App. Div. Nov. 14, 2005).  Petitioner appealed.  The conviction was affirmed in an unpublished decision dated January 21, 2001.  *See* Opinion, *State v. Post*, Docket No. A-628-97T4 (January 21, 2001).  On June 6, 2001, the Supreme Court of New Jersey denied certification.  No petition for certiorari was filed with the United States Supreme Court.

Petitioner subsequently filed a petition for post conviction relief ("PCR petition") in the Law Division.  After an evidentiary hearing was held, the Law Division denied the PCR petition in a written opinion dated August 11, 2003.  *See* Finding of Fact & Conclusions of Law on Petition for Post-Conviction Relief, *State v. Post*, Ind. No. 96-04-0488, PCR Docket No. 16148 (N.J. Super. Ct. Law. Div., August 11, 2003) (referred to herein as "PCR Opinion").  In a decision dated November 14, 2005, the Appellate Division affirmed the denial of post conviction

---

[1]Zulima Farber was named as a defendant in this matter.  Farber was sued in her official capacity as the Attorney General of New Jersey.  Therefore, pursuant to Fed. R. Civ. P. 25(d) Ann Milgram, the current Attorney General, has been substituted.

relief.  *See* Opinion, *State v. Post*, Docket No. A-603-03T1 (N.J. Super. Ct. App. Div., November

14, 2005) ("November 14 Opinion").

Below are the background facts in this matter as set forth by the New Jersey Superior

Court Appellate Division:

> The jury's conviction arose from the stabbing death of Andrew Whited on
> November 16, 1995 in a South Broad Street apartment in Trenton.  The State
> produced a number of eyewitnesses, namely codefendants Michael Levering,
> Nicholas Migliaccio and Brus Post.  Their stories of how the murder occurred
> were corroborated by blood stains found in the apartment, blood found in the
> vehicle used to dispose of the victim's body and the location and physical
> condition of the body when found about a month later.
>
> On December 28, 2003, a Trenton Police detective obtained information from a
> crack dealer to whom codefendant Michael Levering talked about the murder,
> apparently inflating his role in the event as a negotiating ploy so that the dealer
> would be impressed and afford him a better deal on his crack purchases.  The
> Trenton detective sought Levering out at his home where he resided with his
> mother.  Levering's mother consented to a search of a Chevy Lumina (owned by
> her but used by her son) parked at her house with a vanity plate reading "LEV" as
> in Levering.  The detective noticed that there was no carpet in the trunk.  When
> arriving home, Levering agreed to talk to the detective.  Levering's statements
> about the murder to the detective led to [Petitioner's] arrest.
>
> According to the record developed during the trial (particularly Levering's
> testimony against defendant), in November of 1995, Steven Yeager, a friend of
> [Petitioner] shared an apartment with Sherry Tucker on South Broad Street in
> Trenton.  Within weeks of Yeager moving into the apartment, his friends,
> including the victim, Nicholas Migliaccio, Brus Post, Michael Levering and
> [Petitioner] would visit him there.  In the late afternoon of November 16, 1995,
> Michael Levering, Nicholas Migliaccio and Andrew Whited arrived at Yeager's
> apartment.  Shortly thereafter, Brus Post and [Petitioner] arrived.  That evening,
> most of the people in the apartment were drinking alcohol and smoking crack.
> Sherry Tucker left the apartment to go to a club and the remaining group settled
> down in the living room to watch a videotape of the movie Pulp Fiction.
>
> As the movie began, the [Petitioner] removed a dagger from his waistband or
> pocket, leaned across Migliaccio and stabbed Whited twice in the chest.  Whited
> jumped up and tried to fight back, but defendant was able to stab him a few more
> times in the head.  The victim struggled to break away into the kitchen, but

defendant continued his assault, stabbing Whited 20 to 25 times in the shoulder, back, side, chest and head.  None of the remaining collection came to the victim's aid.  Finally, the victim fell to the floor and apparently believing that he was still alive, [Petitioner] sawed at his throat using the dagger he bent when stabbing whited in the head and then "sawed at his neck" using another knife procured from an unknown location.

Thereafter, Levering's Chevy Lumina was used to transport the body of Andrew Whited from the apartment location as Migliacio and [Petitioner] delivered and loaded it into the trunk of the Lumina.  Levering drove the vehicle and Brus Post and Steven Yeager remained behind to clean up the apartment.  Seeking gas money to be able to drive to the Pine Barrens to dump the body, Levering drove to his mother's house.  While at Levering's mother's house, [Petitioner] cleaned some blood off of himself in the kitchen sink.  When Levering's mother came downstairs to see what was going on, Levering and [Petitioner] asked her for gas money, assuring her that everything was "all right."  After some hesitation, she gave her son money.  Following the purchase of gas at a South Broad Street gas station, Levering and [Petitioner] drove east on I-195.  After some discussion as to where to dump Whited's body, Levering and defendant dragged it out of the trunk of the Lumina and deposited it about 40 feet into wooded underbrush on the side of I-195.  Thereafter, they cleaned the Lumina and disposed of the bloodstained carpet in the trunk.

On December 18, 1995, the frozen corpse of Andrew Whited was found in the wooded area alongside Interstate 195 where it intersects with Route 537 in Millstone Township, Monmouth County.  An autopsy revealed that Whited suffered 29 separate stab wounds to the head, neck, chest, back and upper extremities.  In an impressive display of criminal cunning, defendant and Levering attempted to conceal Whited's identity by pseudo-surgically excising tattoos located on each of his arms with a knife.  Less impressively, they overlooked a Trenton Municipal Court order bearing the victim's name which was found in the decedent's pants pocket.

*State v. Post*, PCR Docket No. 16148 (N.J. Super. Ct. August 11, 2003) *aff'd*, *State v. Post*,

Docket No. A-603-03T1 (Nov. 14, 2005).

In the Petition presently before the Court, Petitioner asserts the following four grounds for

relief:

I.  Petitioner was denied effective assistance of counsel in the Trial Court.

4

II.  The conviction was obtained by an unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

III.  The conviction was obtained by denying defendant due process of law.

IV.  The conviction was obtained by action of a petit jury that was unconstitutionally obtained.

Pet. at 5-7.

The State filed an Answer to the Petition arguing that the Petition fails to establish grounds for the relief sought and, therefore, should be denied.

## II.  Standard of Review

A habeas corpus petition must meet "heightened pleading requirements."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citing 28 U.S.C. § 2254 Rule 2(c)).  The petition must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  See 28 U.S.C. § 2254 Rule 2(c)(1), (c)(2), (c)(3).

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); *accord Barry v. Bergen County Probation Dept.*, 128

F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith v. Phillips*, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable." *Engle v. Isaac*, 456 U.S. 107, 120 n.19 (1982).  Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief.[2]  Nor may the Court recharacterize a ground asserted under state law into a federal constitutional claim.[3]  "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not

---

[2] *See, e.g., Withrow v. Williams*, 507 U.S. 680, 695-96 (1993) (where habeas petition raised claim that the police had elicited petitioner's statements without satisfying <u>Miranda</u>, the district court erred when it "went beyond the habeas petition and found the statements [petitioner] made after receiving the <u>Miranda</u> warnings to be involuntary under due process criteria"); *Baker v. Barbo*, 177 F.3d 149, 156 n.7 (3d Cir. 1999) (where petition contains ground asserting the ineffective assistance of counsel during plea negotiations and trial, court is not permitted to consider ground, evident from the facts but not raised in the petition, that appellate counsel was ineffective by failing to advise petitioner that he faced a longer sentence by appealing the conviction).

[3] *See Engle*, 456 U.S. at 119-20 & n.19 (insofar as petitioners simply challenged the correctness of the self-defense instructions under state law, their petitions alleged no deprivation of federal rights and § 2254 was inapplicable); *Kontakis v. Beyer*, 19 F.3d 110, 116-17 & n.10 (3d Cir. 1994) (where petitioner asserted in § 2254 petition that the exclusion of testimony violated his rights under state law, federal court may not consider ground, not set forth in the petition, that exclusion of the testimony violated his federal due process rights).

generally raise a constitutional claim." *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir. 1997) (citations and internal quotation marks omitted); *see also Smith v. Zimmerman*, 768 F.2d 69, 71, 73 (3d Cir. 1985).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated Petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court. See 28 U.S.C. § 2254(d). Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural,

or other, ground." *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004) (citations and internal

quotation marks omitted), *reversed on other grounds sub nom. Rompilla v. Beard*, 545 U.S. 374

(2005); *see also Rolan v. Vaughn*, 445 F. 3d 671, 678 (3d Cir. 2006) ("Here, because the PCRA

appellate court found that Vargas was not willing to testify at the guilt phase of Rolan's trial, its

decision to deny habeas relief on that basis constituted an adjudication on the merits").  A state

court may render an adjudication on the merits of a federal claim by rejecting the claim without

any discussion whatsoever.  *See Rompilla*, 355 F.3d at 247.  On the other hand, "[i]f the

petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. §

2254(d) does not apply, and federal courts undertake a de novo review of the claim." *Rolan*, 445

F. 3d at 678.

  As the New Jersey courts adjudicated Petitioner's claims on the merits, this Court may

not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied.  <u>See</u> 28 U.S.C. § 2254(d).

Accordingly, this Court may not grant habeas relief to Petitioner unless the adjudication of a

federal claim by the New Jersey courts involved an unreasonable application of clearly

established Supreme Court law, <u>see</u> 28 U.S.C. § 2254(d)(1), or was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding and

Petitioner is in custody in violation of the Constitution or laws or treaties of the United States,

<u>see</u> 28 U.S.C. § 2254(a), (d)(2).

  When the grounds raised in a petition are governed by 28 U.S.C. § 2254(d)(1), which

prohibits a district court from granting habeas relief with respect to any claim that was

adjudicated on the merits in state court proceedings unless the adjudication of the claim "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. *See Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.   A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[4]  Id. at 409-10.  "The unreasonable application test is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." *Thomas v. Varner*, 428 F. 3d 491, 497 (3d Cir. 2005) (quoting *Jacobs v. Horn*, 395

---

[4] "[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent." *Marshall v. Hendricks*, 307 F.3d 36, 71 n.24 (3d Cir. 2002) (citations and internal quotation marks omitted).

F. 3d 92, 100 (3d Cir. 2005)).

**III. Discussion**

A.  Ineffective Assistance of Counsel Claims

Petitioner's first ground for relief alleges that "Petitioner was denied effective assistance of counsel at the Trial Court."  Petitioner alleges two deficiencies on the part of trial counsel. Petitioner's first assertion is that trial counsel was aware of two witnesses, Harry Washington and Curtis Jordan, who may have been able to provide exculpatory testimony on defendant's behalf, but counsel never interviewed them as potential witnesses.

Petitioner's second assertion relates to evidence of the victim's allegedly violent character.  Specifically, Petitioner alleges that

> Trial Counsel attempted to introduce evidence of the victim's violent character, but was denied by the trial court because self-defense was not in the case. Thereafter, evidence of self-defense was introduced into the case through [Petitioner's] brother.  Trial [C]ounsel never again tried to get the victim's violent character into evidence.

Pet. at 5-6.  The Court shall address each argument in turn.

1.  Failure to Interview Witnesses

With regard to ineffective assistance of counsel claims, the "clearly established Federal law" that is applicable is the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  *See id.* at 688-89; *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005); *Keller v. Larkins*, 251 F.3d 408, 418 (3d Cir.), *cert. denied*, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 688.  "In any

case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances." *Id.*  The Supreme Court further

explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense
> after it has proved unsuccessful, to conclude that a particular act or omission of
> counsel was unreasonable.  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689 (citations omitted); *see also Virgin Islands v. Wheatherwax*, 77 F.3d 1425, 1431 (3d

Cir.), *cert. denied*, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show

that counsel's substandard performance actually prejudiced his defense.  *See Strickland*, 466 U.S.

at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The

reviewing court must evaluate the effect of any errors in light of the totality of the evidence.  *See*

*id.* at 695-96.  Thus, the petitioner must establish both deficient performance and resulting

prejudice in order to state an ineffective assistance of counsel claim.  *See id.* at 697; *see also*

*Jacobs*, 395 F.3d at 102; *Keller*, 251 F.3d at 418.

In this case, the PCR court examined Petitioner's ineffective assistance claims.  The court first looked at the Petitioner's claims regarding the potential witnesses, Curtis Jordan and Harry Washington.  Jordan's proposed testimony was provided to the court in a statement that was taken on July 1, 2002, five year's after Petitioner's trial.  *See* PCR Opinion at 9.  In that statement, Jordan stated that he met Petitioner while both were incarcerated at the Mercer County Detention Center.  Jordan contended that Petitioner told him that

> they found out [the victim] was a 'rat' . . . He said that they were only going to beat the guy up. . . [Petitioner] said that [the victim] was a little faster than he thought he would be and he started getting the better of [Petitioner] . . . they fell to the floor, still fighting and [the victim] was on top of [Petitioner]. . . . That's when everything got out of control . . . [Petitioner] saw that [the vicim] had blood on his shirt. . . . [Petitioner] saw [another defendant] back away and drop a knife.

PCR Opinion at 9.

Trial counsel testified at the evidentiary hearing before the PCR court.  In its Findings of Fact and Conclusions of Law, the PCR court noted that

> trial counsel could not recall ever talking to Jordan and had no recollection of discussing Jordan with [Petitioner's] mother.  Although [Petitioner's] mother testified to the contrary, her testimony, especially with respect to conversations about Jordan, appeared to be less than credible when she was cross-examined about how she heard about Jordan.  Upon examination of Jordan's statement at this court's hearing, trial counsel stated that it would probably have been a good idea to interview Jordan had he known about him at the time of trial.

*Id.* at 10.

The court further noted, with respect to the possibility of calling Jordan to testify had counsel known of him, that trial counsel stated as follows: "there's no way . . . I would have to be hopelessly boxed in to put his on."  *Id.*  Trial counsel's concern "appeared to be based on the fact that any statements made to Jordan by the defendant were simply raw self-serving and

inadmissible hearsay." *Id.*  Additionally, the court noted that the credibility of the witness as a "jailhouse snitch" was suspect, and Jordan's statement "clearly placed defendant at the scene of the crime and contained a motive for the killing." *Id.*

The PCR court concluded that "it is unlikely that trial counsel was aware of Curtis Jordan's potential testimony at the time of trial.  Citing *Strickland*, the court stated "[n]otwithstanding, even if trial counsel was aware of Jordan and his claimed available testimony at the time of trial, the contents of his statement are far from being such that it would have changed the outcome of defendant's trial."  Consequently, the court found that Petitioner had "failed to demonstrate that his attorney did not serve as reasonably competent counsel for not having interview Curtis Jordan in preparation for trial."  PCR Opinion at 11.

Turning to Harry Washington, the PCR court noted Washington provided a statement prior to trial, which was included in the discovery provided to trial counsel by the state.  PCR Opinion at 11.  This statement was given to police in furtherance of a plea agreement for Washington on pending drug charges.  Transcript of PCR Hearing (July 1, 2003) ("PCR Tr.") at 45.  Washington alleged that he spoke to co-defendant Mike Levering while at the Mercer County Detention Center.  His statement places Levering in the position of ringleader, but still inculpates all the co-defendants, including petitioner, in the death of Whited.

Trial counsel testified that he was aware of Washington's statement, but he made the decision not to investigate Washington's claims.  Citing *Strickland*, the PCR court examined the reasonableness of trial counsel's decision.  *See* 466 U.S. at 690-914 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate

13

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.).  The court noted that trial counsel stated that he would have been extremely reluctant to put on such a witness because he would be a "wild card," *i.e.*, the witness may stick to a positive version of the facts on direct but would "wither significantly on cross."  Further, trial counsel testified that Petitioner was adamant that "he never wanted to be considered a rat" and would not agree to place the blame on anyone else, thus removing this strategy from defense counsel's arsenal.  PCR Op. at 13.

Ultimately, the PCR court found that counsel's performance was not deficient for failing to interview Washington because (1) counsel had already obtained Washington's statement in discovery; (2), counsel doubted that Washington's credibility would hold upon cross-examination because Washington was a jailhouse snitch; (3) Petitioner would not let counsel employ a defense strategy that would place the blame for the crime on anyone else; and (4) counsel endeavored to avoid the notion of self-defense because, at best, it leads to a conclusion that Petitioner participated in the attack and, at worst, that Petitioner was solely responsible for the victim's death.  *Id.* at 13-14.

The Appellate Division affirmed the decision of the PCR court, stating that "[b]ased on our analysis of the record and the judge's Findings of Fact and Conclusions of Law, we are satisfied that the testimony presented by trial counsel provides substantial and credible support for the judge's conclusion that (1) Curtis Jordan's statement was 'far from being such that it would have changed the outcome of the trial' and (2) counsel's decision not to interview Harry Washington or to call him as a witness at trial was a matter of deliberate trial strategy that was reasonable and consistent with defendant's insistence that he "never wanted to be considered a

14

rat." November 14 Opinion at 5.

After careful review of the record in this matter, the Court finds that, Petitioner has not demonstrated that counsel's performance was deficient by failing to interview Jordan and Washington.  As to Curtis Jordan, the PCR court found that it was unlikely that trial counsel knew about this witness.  This factual finding is not contradicted in the record by clear and convincing evidence and, therefore, is entitled to deference from this Court.  See 28 U.S.C. § 2254(e)(1) (the determination of a factual issue by a state court is "presumed correct" unless this presumption is rebutted by clear and convincing evidence.)  Additionally, this Court, consistent with the holdings by the state courts, agrees that there is no evidence that establishes -- even if counsel had known about Jordan -- that but for counsel's failure to interview him the result of the proceeding would have been different.  *See Strickland*, 466 U.S. 690-91.

With respect to Harry Washington, the record reflects that trial counsel obtained Washington's statement prior to trial through discovery and made a determination not to call Washington as a witness.  PCR Tr. at 15.  In trial counsel's professional judgment, Washington was a "wild card" that would be fearful of putting on as a witness.  *Id.* at 16.  Further, Washington's statement was not entirely consistent with counsel's defense strategy, which intentionally did not focus on self-defense.  *Id.*

In sum, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts with respect to Petitioner's claim that trial counsel was ineffective for failure to interview Jordan and Washington "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination

15

of the facts in light of the evidence presented in the State court proceeding." The state courts correctly applied the *Strickland* federal standard to Petitioner's claim, and reasonably applied the facts of the case in their decisions. Thus, Petitioner is not entitled to habeas relief for this ineffective assistance of counsel claim.

2.  Failure to Introduce Evidence of Victim's Violent Character

In the course of questioning a witness who was an acquaintance of the victim, defense counsel attempted to ask whether the witness had "ever see[n] [the victim] with a knife?" R8 at 114-115. Counsel also sought to ask this witness whether she knew if the victim "was a robber," and whether she had "seen him with a gun." R8 118-19. According to defense counsel, this witness had told an investigator that the victim "stole stuff, . . . had a gun with him a couple of days before he died, and that he used to beat up on lots of people." R8 at 119. Defense counsel also advised the judge that he wanted to introduce evidence that the victim "was a very dangerous armed robber that robbed drug dealers on Walnut Street on a regular basis." R8 at 120. The defense argued that such evidence was probative of a possible motive for others to want to kill the victim.

The state objected to the admission of such evidence on the grounds that (1) the character of the victim was only relevant to the issue of self-defense, which, was not an issue in the case at that time; and (2) there was no good-faith basis to argue third party guilt. R8 at 119-20. The trial court denied counsel's request to admit the bad character evidence because first, there was no indication that the witness had any personal knowledge of the facts alleged and, second, it was irrelevant. R8 at 121.

Petitioner now alleges that counsel should have sought to reintroduce such bad character

evidence after the testimony of Brus Post, whose testimony introduced the theory of self-defense into the case.  However, even if, as Petitioner argues, this resolved the problem with relevance, the issue that the witness did not have personal knowledge to testify to the alleged facts remained.  In the Law Division's hearing on Petitioner's PCR petition, defense counsel admitted that he did not have a witness with personal knowledge of these facts.  PCR Tr. at 34 ("I really didn't have a witness to say that, I really didn't have a witness, I believe I had some amorphous information in police reports . . .").  It appears, therefore, defense counsel did not have a competent witness to testify to the allegations regarding the victim's bad character.  As such, counsel's failure to attempt to reintroduce this bad character evidence does not support Petitioner's claim for ineffective assistance of counsel.  As to this ground, the Petition is denied.

B.  Failure to Disclose Favorable Evidence Claim

Petitioner states his second ground for relief as follows: "The conviction was obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant."  Pet. at 6.  Petitioner asserts that "[a] number of jailhouse informants had come forward to the police indicating that co-defendants in this case had confessed to the murder."  *Id.* Defense counsel asked for the names of these informants, but was refused by the State and Trial Court."  *Id.*  The record shows that immediately before jury selection, as the parties were discussing "housekeeping matters" with the trial court, the prosecutor made the following statement with respect to the jailhouse informants:

> During the course of this proceeding, or even prior to this proceeding, literally almost a dozen people came forward indicating that they had spoken to various defendants in this case who had made admissions to them with respect to the charges which are involved in this indictment.  The state has elected not to use those individuals, primarily because the state felt uncomfortable with the

17

> testimony, only because the information they were giving, while accurate, could
> have been gleaned from newspaper reports or access to defendant's discovery.
> Obviously, because of the press that surrounded this case in the last month, a
> number of people had come forward indicating that Joe Post had made admissions
> to them about his involvement in the murder of Andrew Whited.

Trial Transcript, R5 at 3.

Petitioner's trial counsel immediately requested that the State "provide [him] with the

names and addresses, if [the State] has them, and the substance of what was said by the other

dozen or so people that he has identified that have come forward and made statements to the

prosecutor, representing that they had conversations with my client or other co-defendants in this

case." *Id.* The prosecution responded that the State would not provide this information to the

defense because the State would not be using those witnesses at trial and release of that

information could jeopardize the lives of the informants. The trial court declined to compel the

prosecution to turn over the names of the inmates.

This issue was first raised by Petitioner in the state court in his PCR Petition. In that

petition, Petitioner deemed the issue a "trial court error",[5] stating that the trial court erred in

denying the defense's request to compel the prosecution to turn over the names and such denial

deprived Petitioner of his "right to a fair trial." PCR Petition at 3. The PCR judge, in declining

to address the issue at length, simply held that trial court errors were to be raised on direct appeal.

On appeal from the denial of PCR, the Appellate Division also did not opine at any length on the

issue, simply finding that this issue and other alleged errors not expressly addressed in the PCR

---

[5]However, Petitioner notes in his brief on appeal from the denial of PCR that "the State's
refusal to provide . . . discovery and the trial court's endorsement of that position" constituted a
due process violation. Petitioner's Appellate Brief–PCR at 15. Further, Plaintiff cites to *Brady
v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963) in his brief. The Court,
therefore, finds that Petitioner assert a *Brady* violation in the state court.

Opinion "lack[ed] sufficient merit to warrant discussion in a written opinion."  *State v. Post*,

Docket No. A-603-03T1 (Nov. 14, 2005) (citing N.J. Court Rule 2:11-3(e)(2) (permitting court

to affirm without written opinion)).

It is somewhat clearer in the instant petition that Petitioner is alleging a violation of

*Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963) (holding "that the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution.").  "A *Brady* violation occurs when the government fails to

disclose evidence materially favorable to the accused."  *Youngblood v. West Virginia*, 547 U.S.

867, 869, 126 S. Ct. 2188, 2190 (2006).  Evidence is considered "material" if "there is a

reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different."  *Id.* at 870.  However, "[t]he mere possibility that an item

of undisclosed information might have aided the defense, or might have affected the outcome of

the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427

U.S. 97, 109-10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

As noted, Petitioner asserts that "jailhouse informants" told the police that "co-defendants

in this case had confessed to the murder."  Pet. at 6.  This is simply not supported by the record.

The record reflects that a number of informants came forward indicating that "various

defendants," including Petitioner, had "made admissions to them" as to "the charges which are

involved in this indictment."[6]  However, there is no indication that any of the defendants

---

[6]Indictment No. 96-04-0488 charged Brus Post, Nicholas Miglicaccio, Michael Levering and Petitioner with murder in the first degree as well as certain charges relating to unlawful possession of a knife.

19

confessed to the actually committing the acts constituting the crimes for which Petitioner was convicted. Moreover, there is no evidence in the record that establishes that the "admissions" by co-defendants had any impeachment value. All three co-defendants entered into plea agreements in this matter, and nothing in the record indicates that the "admissions" made to the jailhouse informants were inconsistent in any way with the co-defendants' pleas or with their testimony against Petitioner. As such, Petitioner's assertion that such evidence would have been favorable to the defense is merely speculation.

Moreover, Petitioner has failed to establish materiality. The record is devoid of evidence that establishes "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood*, 547 at 870. At most, Petitioner has raised the "mere possibility that [the] undisclosed information might have aided the defense, or might have affected the outcome of the trial." *Agurs*, 427 U.S. 97, 109-10. That is not sufficient to establish Petitioner's claim of a *Brady* violation.

C. Additional Due Process Claims

In addition to his *Brady* claim, Petitioner alleges other due process violations. First, Petitioner alleges that "[t]he trial court refused to charge the jury on Passion/ Provocation Manslaughter as a lesser-included offense, even though there was enough of a heated dispute to get a self-defense charge." Pet. at 6. Next, Petitioner claims that "[t]he prosecutor's opening statement improperly played upon the emotions of the jury by repeated emphasizing the 'viciousness' of the attack." *Id.* at 7. Last, Petitioner alleges that "[t]he trial court erroneously instructed the jury that they should convict Defendant if they believed Brus Post's testimony, where Brus Post exonerated Defendant and formed the basis for the self-defense charge." *Id.*

i.  Failure to Charge Jury on Lesser-Included Offense

"Due process requires that a lesser included offense instruction be given when the

evidence warrants such an instruction.  But due process requires that a lesser included offense

instruction be given only when the evidence warrants such an instruction."  *Hopper v. Evans*, 456

U.S. 605, 611 (1982).  *See also Keeble v. United States*, 412 U.S. 205, 208 (1973) (A lesser

included offense instruction should be given "if the evidence would permit a jury rationally to

find [a defendant] guilty of the lesser offense and acquit him of the greater.").

In New Jersey,

[p]assion/provocation manslaughter has four elements: the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying. ... If a slaying does not include all of those elements, the offense of passion/provocation manslaughter cannot be demonstrated.

*State v. Mauricio*, 117 N.J. 402, 411 (1990).  In the instant case, the trial judge denied

defendant's request for a passion/provocation charge, and the Appellate Division affirmed,

finding that "no combination or permutation of the various stories [of the eyewitnesses] ... would

permit a finding of passion."  The appellate court found that if the certain testimony of

defendant's brother was believed by the jury, it would permit "a finding of provocation and

perhaps a finding that the provocation was adequate to inflame," but that "no rational basis

existed in the evidence for a finding that the defendant was actually impassioned."   Opinion,

*State v. Post*, Docket No. A-628-97T4 at 3, 4 (January 21, 2001).  This factual finding is not

contradicted in the record by clear and convincing evidence and, therefore, is entitled to

deference from this Court.  See 28 U.S.C. § 2254(e)(1).  Moreover, even if the presumption did

21

not exist, Petitioner's claim would fail.  This Court finds that the evidence at trial simply did not

warrant a passion/provocation charge.  As noted by the Appellate Division, the record lacks the

evidence necessary to establish all of the elements of that offense and, as such, due process did

not require the jury to be so charged.  As such, Petitioner has not demonstrated that the decision

of the Appellate Division was either contrary to or an unreasonable application of clearly

established federal law, or that it was based on unreasonable determination of the facts in light of

the evidence before the state court.  Consequently, the Petition is denied as to this ground.

    ii.  Prosecution's Opening Statement

Petitioner alleges that the prosecutor's opening statement was improper because it

"repeatedly emphasiz[ed] the 'viciousness' of the attack."  Pet. at 7.  In his opening statement,

the prosecutor, after describing the charges in the indictment, stated as follows: "But what the

indictment doesn't tell is the viciousness and the outright savagery with which this man

committed this murder."  The prosecutor goes on to describe the victim's 29 stab wounds, and

then states that  "[t]here were other injuries just as vicious."  He describes "some examples" such

as the victim's carved out tattoos, a gaping wound in his neck, a hole in his heart, and a stab

wound to the eye that, when inflicted, was preceded with a question posed by the defendant: "Did

anybody ever hear an eyeball squish?"  R7 at 22-23.

Petitioner raised the issue on direct appeal, and the Appellate Division found that the

statements by the prosecutor

> were reasonably related to evidence the State expected to produce and that there
> was no evidence of bad faith on the part of the prosecutor.  It did not exceed the
> leeway afforded to prosecutors in their opening statements.  Any prejudice that
> may have resulted from these statements was adequately cured by the general
> instructions that statements by attorneys are not evidence.  Moreover, the conduct

could not be characterized as conduct so egregious as to have deprived defendant of a fair trial.

*State v. Post*, Docket No. A-628-97T4 (January 24, 2001) (citations omitted).

Where a prosecutor's opening or closing remarks are challenged in habeas case, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  It is not enough for those comments to have been "undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Rather, for a due process violation to exist, the misconduct needs to be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).  The Court has reviewed the entirety of the opening statement and considered the opening statement as part of the entirety of the trial.  The Court finds that none of the prosecutor's comments were so egregious that they " infected the trial with unfairness as to make the resulting conviction a denial of due process."  Consequently, the Court finds that the decision of the Appellate Division was neither contrary to nor an unreasonable application of clearly established federal law.

### iii.  Jury Instructions

As part of its charge to the jury, the trial court instructed the jurors as follows:

Also, Brus Post, Michael Levering, and Nicholas Migliacci, three of the original defendants in this indictment, have admitted their guilt as to certain crimes involving this incident, and they have testified on behalf of the state.  Ladies and gentleman, the law requires that the testimony of such witnesses be given careful scrutiny.  In weighing their respective testimonies, therefore, you may consider whether each has a special interest in the outcome of the case and whether his testimony was influenced by the hope or the expectation of any favorable treatment or reward or by any feelings of revenge or reprisal.  If you believe any or

> all of these witnesses to be credible and worthy of belief, you have a right to
> convict the defendant on that testimony alone, provided, of course, that upon
> consideration of the whole case you are satisfied beyond a reasonable doubt of the
> defendant's guilt.

R. 16 at 133.  Petitioner argues that this instruction , specifically, "*If you believe any or all of these witnesses to be credible and worthy of belief, you have a right to convict the defendant on that testimony alone,*" deprived him of a fair trial because Brus Post, although called as a witness for the State, provided testimony that, if believed, could have exonerated defendant because it formed the basis of a self-defense claim.  Pet. at 7.

This issue was first raised by Petitioner in the state court in his PCR Petition.  PCR Petition at 3.  The PCR judge did not directly address the issue, holding that trial court errors were to be raised on direct appeal.  On appeal from the denial of PCR, the Appellate Division also did not expressly address the issue, finding that it as well as other issues that were not expressly addressed in the PCR Opinion "lack[ed] sufficient merit to warrant discussion in a written opinion."  *State v. Post*, Docket No. A-603-03T1 (Nov. 14, 2005) (citing N.J. Court Rule 2:11-3(e)(2) (permitting court to affirm without written opinion)).

The standard for reviewing jury instructions is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 319 (1990)).  Claims of erroneous jury instructions do not generally form the basis for habeas relief.  *See United States ex rel. Dorey v. New Jersey*, 560 F.2d 584, 587 (3d Cir.1977); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203

(1977).  Challenges to instructions are not cognizable on collateral review unless the disputed instruction "so infected the entire trial that the resulting conviction violates due process." *Polsky v. Patton*, 890 F.2d 647, 650 (3d Cir.1989) (*quoting Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)).  The burden of demonstrating that an erroneous instruction was so prejudicial that it supports a collateral attack is weightier than that necessary to establish plain error on direct appeal.  *See Henderson*, 431 U.S. at 154-55, 97 S.Ct. at 1736-37; *Kontakis v. Beyer*, 19 F.3d 110, 114 (3d Cir.1994) (stating that federal courts are limited to deciding if a state conviction violates federal law).

Examining the challenged language in the context of the entire jury instruction, *see Smith v. Horn*, 120 F.3d 400, 411 (3d Cir.1997) (noting that "allegedly constitutionally infirm language must be considered in the context of the charge as a whole"), the Court finds that there is no "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Buchanan*, 522 U.S. at 276.  In particular, the language that immediately follows the challenged language, namely, *"provided, of course, that upon consideration of the whole case you are satisfied beyond a reasonable doubt of the defendant's guilt*," eliminates the possibility that the challenged language prevents the jury from considering constitutionally relevant evidence.  It is clear that the judge instructed the jurors that they could only convict after "consideration of the whole case." R.16 at 133.  Consequently, the Court finds that Petitioner's Petition fails on this ground.

D.  Jury Claims

Last, Petitioner claims that his "conviction was obtained by action of a petit jury that was unconstitutionally obtained" because the trial court (1) "denied [Petitioner's] request to excuse a

25

juror for cause whose relative had been murder victims"; and (2) "failed to voir dire the jury panel when one potential juror reported seeing the Petitioner make an obscene gesture."  Pet. at 7.  Petitioner raised the first issue on direct appeal in state court, and the second was raised in his PCR Petition.

On direct appeal, the Appellate Division found without merit Petitioner's contention that he was denied a fair trial by rejection of his caused-based challenge to a juror whose first cousin and cousin's baby had been murdered by the cousin's husband in California ten years earlier.  *See* Opinion, *State v. Post*, Docket No. A-628-97T4 at 5 (January 21, 2001).   The Appellate Division found that failure to excuse the juror was not error because "the events and relationship were remote and the juror was clear that these events would not affect her consideration of the case."  *Id.*

As to the second issue, the failure to voir dire the jury regarding an alleged obscene gesture by the Petitioner, it appears that the issue was first raised by Petitioner in the state court in his PCR Petition.  PCR Petition at 3.  The PCR judge rejected the claim, holding that trial court errors were to be raised on direct appeal.  On appeal from the denial of PCR, the Appellate Division found that the issue "lack[ed] sufficient merit to warrant discussion in a written opinion."  *State v. Post*, Docket No. A-603-03T1 (Nov. 14, 2005).

The Sixth and Fourteenth Amendments guarantee the right to an impartial jury.  An impartial jury is one that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, rather than preconceptions or other extraneous sources of decision. *Patton v. Yount*, 467 U.S. 1025, 1037 n. 12 (1984); *Irvin v. Dowd*, 366 U.S. 717, 721-23 (1961). The Due Process Clause of the Fourteenth Amendment also requires the trial court to ensure that

the defendant's right to an impartial jury is not violated.  If the court becomes aware of a possible source of bias, the court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial ."  *Remmer v. United States*, 347 U.S. 227, 230 (1954); *see also United States v. Thomas*, 463 F.2d 1061, 1063-64 (7th Cir.1972).  Thus, due process means both: (1) a jury capable and willing to decide the case solely on the evidence before it; and (2) a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

The Court first turns to Petitioner's claim regarding the trial court's failure to excuse the juror whose cousins were murder victims 10 years earlier.  When questioned by the trial court judge, this juror stated that she did not think the murders would have any bearing on her ability to be fair and impartial.  R6 at 4.  She stated that she was not very close to her cousin, who lived in and was murdered in California.  *Id.* at 5-6.  The murders were committed by the victim's husband, who committed suicide after the killings.  *Id.*

The finding by the state court of this juror's impartiality is accorded a presumption of correctness that can be overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  The Court finds nothing in the record that would overcome this presumption.  Nor is there anything to demonstrate that the state courts' rejection of Petitioner's jury bias claim was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner's claim with respect to potential jurors possibly seeing the defendant make an obscene gesture to a sheriff's officer similarly fails.  At the end of the first day of jury selection,

27

one potential juror told the trial judge the following:

[Juror]:      Your Honor, I don't think that I could be a fair juror in this case.
I've been the victim of assault, robbery, burglary, multiple car
break-ins.  I'm a trial attorney.  I work in the city.

* * *

I know at least four people that have been the victims of knife
attacks, and I was witness to one of them.

* * *

The Court:    You're an attorney, did you say? . . . And you can't put your
personal experiences aside and render a fair and impartial verdict
in accordance with your oath as a juror?

[Juror]:      I also witnessed certain behavior in court, you know, which – if
you'd like me to say what I observed.

The Court:    No, no.  If you feel you cannot be a fair and impartial juror, then I
will excuse you.

R5 at 217-218.  Although the trial judge excused the juror at this point, defense counsel asked to
hear what the juror observed.  The juror replied: "I witnessed the defendant sort of giving the
finger to one of the sheriff's deputies, and I don't think that's appropriate."  R5 at 218.  Trial
counsel did not raise the issue any further, and the judge did not question the other potential
jurors to determine if others may have witnessed the same thing.

A judge should normally undertake an assessment of a source of possible juror bias by
questioning jurors directly, along with the participation and input of counsel.  *See Smith v.*

28

*Phillips*, 455 U.S. 209, 217 (1982).  However, that is not always required.  Rather, the adequacy of the trial court's actions are "a function of the probability of bias; the greater that probability, the more searching the inquiry" should be.  *Oswald v. Bertrand*, 374 F.3d 475, 480 (7th Cir. 2004).  The incident here – defendant "sort of giving the finger to one of the sheriff's deputies" – implicates an extremely low probability of bias.  Indeed, Petitioner's trial counsel did even not request that the remaining potential jurors be questioned.  Moreover, to the extent such an action by Petitioner would create any bias whatsoever, it was the result of Petitioner's own misconduct.  Given the unlikelihood that the Petitioner's actions would have created bias, the Court finds that the state court's denial of Petitioner's PCR Petition on this ground was neither contrary to nor an unreasonable application of clearly established federal law, nor was based on unreasonable determination of the facts in light of the evidence before the state court.  The Petition, therefore, is denied as to this ground.

**IV.  Certificate of Appealability**

This Court next must determine whether a certificate of appealability should issue.  *See* Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

**V.  Conclusion**

For the reasons above, the Petition is denied.  An appropriate Order accompanies this

Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.